[No. 2263.]

## W. R. ORMAN v. THE STATE.

1. EVIDENCE.—PRIVILEGED COMMUNICATIONS IN CRIMINAL CASES are subject to two rules. First: To be privileged, the communications must pass between the client and his attorney in professional confidence, and in the legitimate course of professional employment of the latter. Second: If the communications are made by the client to the attorney before the commission of the crime, and for the purpose of being guided or helped in its commission, they are not privileged;—and this second rule is not affected by the fact that the attorney was wholly without blame. See the opinion *in extenso* for communications of a client to his attorney *held* not to be privileged.

2. MANSLAUGHTER—CHARGE OF THE COURT instructed the jury upon the subject of manslaughter as follows: "If you believe from the evidence beyond a reasonable doubt that the defendant did unlawfully kill William Houghston by shooting him with a pistol, and that the same was done under the immediate influence of sudden passion (as herein-before defined), arising from an adequate cause, such as insulting words or conduct of the said Houghston towards female relatives of defendant, you will find defendant guilty of manslaughter." *Held* erroneous, because, if the passion produced by an adequate cause be the result of insulting words or conduct towards a female relative, the instruction in effect requires that the killing, in order to constitute manslaughter, must immediately follow the utterance of the insulting words, in order to be sudden, and does not mitigate the offense to the grade of manslaughter if the insulting words were uttered in the absence of the slayer, though the killing occurred at the first meeting of the parties after the slayer had been informed of the insulting words. But see the opinion for a subsequent instruction, which is *held* by a majority of the court to correct this error.

3. SAME—SELF DEFENSE.—Upon the subject of self defense, the trial court charged the jury as follows: "Homicide is justifiable in the protection of the person against any unlawful and violent attack, but in such case all other means must be resorted to for the prevention of the injury, and the killing must take place while the person killed is in the very act of making such unlawful and violent attack." The true rule upon the subject is as follows: If the killing is to protect the person against an unlawful and violent attack, and such unlawful and violent attack is not *mutual*, or is not such as is described in Article 568 of the Penal Code, then the party killing must resort to all other means to prevent the injury, and the killing must take place while the person killed is in the very act of making such unlawful and violent attack. *Held* that, whether right or wrong in the abstract, the charge as given was errone- ous in view of the evidence, which, if it discloses any attack by the

deceased, discloses such an one as is contemplated by Article 568, *supra*, and as would authorize a killing at once. See the opinion *in extenso* on the subject.

APPEAL from the District Court of McLennan. Tried below before the Hon. Eugene Williams.

Under an indictment charging him with the murder of William F. Houghston, in McLennan county, Texas, on the eighth day of September, 1885, the appellant was convicted of murder in the second degree, and his punishment was assessed at a term of fourteen years in the State penitentiary.

Kate Horton was the first witness for the State. She testified that she was an eye witness to the shooting of the deceased by the defendant, which occurred on Second street in the city of Waco, Texas, on the eighth day of September, 1885. At that time the witness was living on Bridge street, but was completing her preparations to remove to the sporting house on Jackson street kept by Edna Elmore. Witness was driven to Miss Elmore's house on the fatal morning by the deceased, in his hack, her purpose being to see Miss Elmore about her quarters. Remaining at Elmore's but a short time, she re-entered deceased's hack, and started back to her home on Bridge street to get her trunk. Reaching a point near defendant's house on Second street, witness saw the defendant step into the street, raise his pistol, and fire two shots. The deceased fell from his seat on the box, and his horses, taking fright, ran away. They were stopped near the Baptist college. Defendant was going down the street from the direction of the court house towards his own house when he met the hack and shot the deceased. Not a word was spoken by either the defendant or the deceased at the time of the shooting. Witness was inside the hack and could not see the deceased's hands at the time of the shooting, and did not know whether or not he had a pistol at that time. The deceased had been drinking, and was somewhat under the influence of whisky at the time of the shooting. The horses were slightly checked up when defendant approached the hack.

Charles Noel was the next witness for the State. He testified, in substance, that, while he was seated in front of the defendant's saloon, in the city of Waco, between nine and ten o'clock, on the morning of the tragedy, the deceased drove to that saloon, coming up Second street. Stopping his hack, the de-

ceased asked if the defendant was in the saloon. Witness replied that he did not think he was, and deceased drove on towards the sporting house of Annie Brown. He was under the influence of whisky at that time. Defendant came to the saloon shortly afterwards, from across the square, remained a short time and left, going towards his home on Second street. Defendant said nothing to anybody at the saloon during the time he was there. Looking up the street a few moments after defendant left, witness saw the deceased's hack, deceased sitting on the box, coming down the street. The attention of witness was next attracted by a pistol shot. Witness then looked up the street and saw defendant standing in the street, in front of his house, in the act of firing his pistol. At the second shot deceased fell from the box of his hack, and his horses ran away with the vehicle, passing through Second into Austin street, towards the court house. Immediately after the shooting, the witness went towards the court house, and reached the defendant just as defendant handed John Baker his pistol, with the remark: "I've killed the d—d son of a b—h." Witness was among the first persons who reached the deceased after he fell. He saw no pistol about the body or person of the deceased. The deceased had no pistol, nor was he attempting to draw one when the second shot was fired. When defendant passed out of the saloon, just before the shooting, going towards the point where it occurred, he appeared to be very angry, and witness saw what he took to be the handle of a pistol under his coat.

A. H. Knott, a policeman, testified, for the State, that he was on duty on Franklin street, near Second street, on the morning of the homicide. Between nine and ten o'clock he heard two reports of a pistol. He ran rapidly towards Second street, and, as he turned the corner, he met the team of the deceased in flight. Farther on he met the defendant with a pistol in his hand, walking towards the court house. The defendant remarked that he had killed the son of a b—h, and was going to the court house to surrender to the sheriff. Looking down the street, the witness saw the deceased on the ground, resting on his elbows. Witness ran to him, and reached him just as he fell over on his face. Witness carried the deceased to the pavement next the court house, where in a few minutes, and in the presence of the crowd which meanwhile had collected, the deceased died, never having spoken after he was shot. When witness reached deceased he was bleeding from a wound in the

face and another in the breast. No pistol was found on or about the body. Witness did not see a dog about the body of deceased. He did not see the shots fired.

Doctor James Vandever, testifying for the State, described the wounds in the face and side of the deceased, the latter of which, he declared, produced death. The State closed.

D. A. Adams was the first witness for the defense. He testified that, at the time of the killing, he was in the employ of defendant as bar tender, at his saloon, known in Waco as the Kentucky saloon. Between five and six o'clock on the fatal morning, the deceased came into the said saloon and asked if defendant was in. Witness replied that he had not yet come from home. Deceased then said that he had been told that defendant had been talking about him ; that defendant had said that he, deceased, was lying up with a negress, who supported him. He said further that the said negress was as good as the defendant's mother or sister, who were bitches, prostituted solely to negroes, and who had made all that defendant had out of the negroes to whom they had prostituted their persons; further, that he, deceased, intended to kill the defendant before twelve o'clock on that day. Deceased repeatedly and persistently made use of such offensive epithets towards defendant. Witness finally told him not to talk in the saloon in that manner ; that customers were constantly passing in and out, and that, if he could find no other language to use, he must leave. Defendant returned twice between that time and nine o'clock, and on each occasion asked if "that d—d son of a b—h has yet come?" About nine o'clock defendant came to the restaurant, which was an attachment to his saloon, and joined witness, who was then at breakfast.

While at breakfast witness told defendant that deceased had been there, repeated to him deceased's language about his, defendant's, mother and sister, and his threat to kill the defendant before twelve o'clock, and advised defendant to prepare himself to encounter the deceased. Defendant replied: "No man can say that about my mother and sister and live." He got up instantly, leaving his breakfast untouched, and went out of the saloon. He came back into the saloon a few minutes later, went behind the bar and sat down with his face between his hands, seemingly in great trouble. He sat thus but a few minutes when he again left and about thirty minutes later witness heard that defendant had killed the deceased.

Cross examined, witness said that defendant's breakfast was brought in from the cook room while he was telling defendant of deceased's visits, abuse and threats, and defendant left it untouched. Martha Downs came into the dining room just before defendant left it and told him that deceased had been about the saloon looking for him, and repeated deceased's threats and remarks about the defendant's mother and sister. Witness generally went off watch between nine and ten o'clock. When defendant came into the saloon the second time and went behind the bar the witness thought that defendant had taken watch. He, therefore, pulled off his apron, preparing to leave. About that time a customer came in and about the time witness got through waiting on him defendant got up and started off. Witness called to him: "Bud, I wouldn't have any trouble with him." Defendant paid no attention to witness, but went off.

Charles Houston testified, for the defense, that he was employed as a waiter in the defendant's restaurant and about the saloon at the time of the killing. Between five and six o'clock on the fatal morning the deceased came into defendant's saloon and asked for the defendant. When told by Mr. Adams that the defendant was not in he proceeded to abuse and denounce the defendant. He said that he had been told that defendant had accused him of lying up with a negress; that the negress was quite as good as defendant's mother and sister, who were nothing but negro serving bitches, who had made all that defendant had by prostituting their persons to negroes, and that he intended to kill the defendant before twelve o'clock. Deceased came back to the saloon twice afterwards on that morning and abused defendant in like manner. Defendant came to his breakfast about nine o'clock, and, while witness was serving his breakfast, Mr. Adams told him of deceased's visits, abuse and threats.

Cross examined, the witness stated that he was unable to say whether or not defendant ate any of the breakfast placed before him. It was on deceased's second visit to the saloon that witness heard him make his statements about defendant's mother and sister. He drove his hack to the side door of the saloon, and had two women in it. Witness knew nothing about the killing.

Green Patterson was the next witness for the defense. He testified, in substance, that he was the proprietor of a meat market, his place of business being two doors north of defend-

ant's place of business. Between five and six o'clock on the morning of the homicide, deceased drove his hack to a point in front of witness's shop, got down and came in. He had been drinking but was not drunk. He proceeded to abuse and denounce the defendant, saying that the defendant had accused him of lying up with a negress who supported him; that the negress was the equal of defendant's mother and sister, who had made all the defendant had by prostitution with negroes, and that he intended to kill the defendant before noon. Witness told deceased that he must not offend the ears of his customers with such language, and to leave his house. Defendant left, and soon returned with two negroes, Dan Jackson and Morris Talley, on his hack. Leaving the two negroes on the hack, the deceased stepped into the witness's place of business and said that there were two negroes—calling witness's attention to them —who had copulated with the mother and sister of the defendant, and that he intended to have them tell defendant so, closing his remarks with the statement: "We hack drivers are hell when we get started, and will do what we say we will do." Witness told deceased to stop his indecent talk and leave, and he did so. Deceased showed no pistol or other arms on either of these visits. Witness did not tell the defendant of those two occurrences prior to the killing.

Bob Armstrong was the next witness for the defense. He testified, in substance, that he was in defendant's saloon about eight o'clock on the fatal morning, when deceased came inquiring for, and abusing the defendant, his mother and sister, in the manner stated by Adams. He said that he intended to kill the defendant before noon. Just then, observing witness, the deceased said: "Hello, Fort Worth; do you know where Bud Orman is?" Witness replied that he had not yet come down, when deceased called witness into the dining room, showed him a black handled thirty-eight calibre pistol and said: "This is what I am going to do the d—d son of a b—h up with. I will find him before I stop." Some one called deceased and he left. His hack was then standing in the alley at the side door of the saloon.

Cross examined, the witness testified that he was not in the defendant's employ at the time of the killing, but did chores about his saloon when there was any to be done, and sometimes played the fiddle in that saloon. Witness did not know whether the pistol shown him by the deceased was a five or six shooter, but knew it was a revolver. He did not report this occurrence

to the defendant prior to the shooting, but did tell several of the defendant's particular friends.

Phil. Eyerling, the witness Patterson's partner in the beef market, testified, for the defendant, substantially as did Patterson, except that, when the deceased returned with the two negro men on his hack, instead of saying that they had copulated with defendant's mother and sister, he said: "I have got the two negroes on my hack who have f—d Bud Orman's sister, and and I expect I can prove they have f—d his mother, too, but I don't know about that; and I am going to take them to Bud Orman and make them tell him so." Patterson then told the deceased that if he did as he threatened, defendant would certainly kill him. Deceased was very drunk. Witness did not communicate these facts to the defendant prior to the killing.

Martha Downs, colored, testified for the defense, that she lived across the alley in the rear of defendant's saloon and restaurant. She was in Leiter's grocery store, next door to defendant's saloon, early on the morning of the fatal day, and saw deceased drive up to the saloon, and heard him make the statements about defendant's mother and sister testified to by Adams. Shaking his fist, deceased said: "This never wears out. I will whip him or he will whip me when I find him"—speaking of defendant. Witness went into defendant's restaurant while defendant was at table with Adams, waiting for his breakfast, and told what deceased had said. Defendant said, in reply, that no man could talk about his mother and sister in that manner, and live. Shortly afterwards defendant came to witness's house and asked her if she would testify in court to the facts she had stated to him, and she replied that she could not do otherwise. Witness was in the saloon shortly afterwards and saw defendant sitting behind his counter, weeping and apparently in great distress. He got up in a few minutes, put his pistol in his pants pocket, and went out at the front door. Bob Armstrong was the defendant's "flunkey" or man of all work.

G. Leiter, testifying for the defense, said that, early on the morning of the day of the killing, he saw the deceased in front of defendant's saloon, and heard him say that defendant accused him, deceased, of sleeping with a "coon," and that he, deceased, then had two "coons" on his hack to prove that defendant's mother and sister slept with "coons." Witness heard no threats uttered.

Cross examined, this witness said that he did not hear de-

ceased say that he would kill defendant, but did hear him say that he would "do" defendant up before noon. Witness did not report to defendant the deceased's remarks about his mother and sister, but told him that Adams, whom he had told, would repeat deceased's remarks to him. Bob Armstrong was working about defendant's saloon at the time of the homicide, and was still staying about there.

Avery Owens testified, for the defense, in substance, that he saw the defendant and the deceased together on the Saturday night before the killing. They were in high spirits with each other, and apparently were very friendly. Witness saw deceased in Roper's alley on the night before the killing, and heard him say that defendant was a d—d son of a bitch, and that he intended to "do up" defendant before ten o'clock next day, and that he meant what he said. Deceased was drinking heavily. Witness saw the deceased with a pistol on his hack twice—once about three months before the killing, and once about two or three weeks before the killing.

W. W. Sinclair, a hack driver, testified, for the defense, that he had seen the defendant riding with the deceased on his hack, but could not say how long before the killing. Deceased was not in the habit of carrying his pistol about with him on his hack, but had done so at times.

J. H. Hart testified, for the defense, that he saw the deceased at the police court in Waco, Texas, on the morning of the killing. He brought some women to that court, and appeared to be drinking, but was not drunk. He said that the witness had no right to search him, and witness, agreeing with him, did not. He then said that defendant had talked about him and Annie Brown, and that he, defendant, could not live. Witness saw no weapon about the person of deceased. Deceased was not regarded as a turbulent, but as a determined, brave man, who would probably execute a threat seriously made. Witness did not tell defendant what deceased said at the police court.

Mrs. Orman, the defendant's wife, was his next witness. She testified that, between nine and ten o'clock on the fatal morning, the deceased drove his hack along Second street, in front of witness's and defendant's house, passing the door in which witness was standing, at a distance of about thirty feet. He drove by slowly, and appeared to be very angry. He had his lines in his left hand and a small black handled pistol in his right hand, held close to his leg. His right side was towards witness, and

she saw the pistol plainly. Defendant shortly drove back over the same route, still holding the lines in his left hand, with his right hand down by his right leg. His left side was then towards witness, his right hand out of her sight, and she could not say that he still had the pistol in his hand. A very few moments afterwards, witness saw the defendant coming towards home, meeting deceased. At a point near the hack, defendant stepped from the side walk to the street, and towards deceased. Witness then saw the defendant throw up his left hand and reach for his pistol with his right. She turned her head, and did not see the shooting which followed. Two shots were fired. Witness stepped out of the house, and saw deceased lying on the ground. Defendant called to her to go back into the house, and said that he was going to the court house to surrender.

Charles Houser, traveling music agent and piano tuner, testified, for the defense, that business called him to South Second street on the fatal morning. Deceased passed the witness at the corner of Jackson and Second street, going down Jackson street. He was driving his team with the lines held in his left hand. In his right hand, which he held close to his leg, he had a small, black handled pistol. No one was in the hack. At a point near Johnson's place, which was nearly opposite defendant's house, the deceased passed witness again, returning over the same route he had recently driven, and then he had a woman in his hack. He was still holding his lines in his left hand, with his right hand held close down by his leg. Witness could not then see his right hand, and could not say that he still had the pistol. Just after the hack passed Johnson's gate, witness observed the defendant on the other side of the street. He stepped from the pavement and asked deceased: "Will you take back what you have said about my mother and sister?" Deceased threw back his head and said "No!" Instantly the defendant threw up his left hand, and with his right hand drew his pistol and fired two shots. Deceased fell from the box. Two wheels of his vehicle passed over his body, and his team ran away. Witness turned in his tracks at once and went back up the street, and proceeded to his place of destination by another route.

Cross examined, witness said that he had never been in the employ of the defendant. He had often played on the piano in defendant's saloon, as, purely for amusement, he had done in other saloons. Witness told no one about what he saw of the

killing, except his wife, until a few days before this trial, when, in a casual conversation with Mr. Ammonett, he told him, expecting him to say nothing about it. Witness did not want to be detained in this case. He knew that it would involve a large loss of time and money, and possibly involve his employment by the house for which he traveled. The defense closed.

A large number of witnesses were introduced in rebuttal by the State, and testified that they knew the general reputation of "Sis" Orman for chastity, and that it was bad. One witness testified that the reputation of Mrs. Orman for chastity was bad before the war. Some of these witnesses, including two or three negroes, testified that Sis Orman had the reputation of cohabiting with negroes. The negroes Dan Jackson and Morris Talley testified that they went to Patterson's beef market with deceased on the morning of the killing, but denied that deceased, in their hearing, made the statements imputed to him by Patterson and Eyerling. Jackson stated that, subsequent to this killing, defendant approached him and told him that he did not want to influence his testimony on this trial, but wanted him to tell the truth, and consequently to swear that deceased had been talking about his, defendant's, mother and sisters, and uttering threats to kill him. Witness promised to so testify, and defendant told him to apply privately to him for what he wanted at any time, and gave witness a half pint of whisky.

The opinion discloses the substance of the testimony of the State's witness Herring.

The motion for new trial raised the questions discussed in the opinion.

*T. A. Blair* and *Herring & Kelley,* filed an able brief and argument for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

HURT, JUDGE. Appellant was convicted of murder of the second degree and sentenced to the penitentiary for fourteen years, for the killing of W. F. Houghston, in the city of Waco, on the eighth day of September, 1885.

We will here insert such facts as will present in a clear light the first error assigned by counsel for appellant. Appellant was a man of family, having a wife, mother and sister. He was a saloon keeper, and his residence was about the distance of one

block from his saloon. Deceased was a hack driver, and it appears was living with a negro woman. Appellant and deceased were upon friendly terms, and were heard to joke each other a short while before the day of the killing.

Early in the morning, between five or six and nine o'clock of the day of the killing, the deceased went to the saloon of appellant two or three times, looking for appellant, and stated openly, boldly, loudly and repeatedly, so that the persons doing business near appellant's saloon heard him, that appellant had accused him of lying up with a negro woman; that appellant was a d—d son of a b—h, and that he intended to kill appellant before twelve o'clock that day; that said negro woman was as good as appellant's mother and sister, and that appellant's mother and sister were negro f—k—ng bitches, and that they had in this way accumulated and made all the property that appellant had. Deceased had a pistol with which he said he was going to do appellant up. He said: "We hack drivers are hell when we get started, and we'll do what we say we will."

On one of the occasions spoken of, deceased drove up to appellant's saloon with two negroes in his hack, and said those negroes had had sexual intercourse with appellant's mother and sister, and that he was going to make them tell appellant so. Deceased drove by appellant's residence and drove near the house and looked in, and appeared to be mad, and was holding his lines in his left hand, with a pistol in his right hand by the side of his right leg. He passed by, and was soon seen by another witness, still having the pistol down by the side of his leg. He soon returned, and as he was passing by appellant's residence, holding his reins in his left hand, with his right hand down by his side, on the opposite side from appellant, he met appellant, who was going from his saloon to his residence, and appellant asked deceased if he would take back what he had said about his mother and sister. Deceased said "No," and at that moment appellant was seen to throw up his left hand, and then the shooting occurred. Deceased received two shots, from which he instantly died. The horses ran away with the hack of deceased. There was a woman in the hack.

After deceased went to appellant's saloon, as before stated, in appellant's absence, appellant went from his home to the saloon —about nine o'clock—and ordered his breakfast. (There was a restaurant in connection with the saloon.) He sat down to eat his breakfast, and just as he sat down he was told that the

deceased had been there looking for him, and was also told that deceased said his (appellant's) mother and sister were negro f—k—ng bitches, and that they had made in that way all the property appellant had.

Appellant got up without eating his breakfast and said: "No man can say that about my mother and sister and live." He sat down behind the counter with his face in his hands, and appeared to be crying and in trouble. He then went out, and a while afterwards came back and got his pistol and put it in his pocket. After appellant was informed of what deceased had said about his mother and sister he went to consult his attorney (M. D. Herring) about the matter, concerning what the punishment would be for killing in such cases. He appeared to be intensely excited—more so than the attorney had ever seen him before, and he had known him from his childhood. He told his attorney what Houghston had said about his mother and sister, as before stated, and asked him what the law was if he killed Houghston. The attorney read him the statute concerning killing, upon the use of insulting words towards a female relative, and advised him to have no trouble with Houghston. He said that was all he wanted to know and started away with his eyes filled with tears. The killing occurred soon afterwards. Appellant went to the court house and surrendered himself immediately after the killing.

M. D. Herring was called as a witness for the State while he was conducting the defense on the trial of the case, and, over objections of defendant, testified, in substance, as follows: Appellant came to my office on the morning of the killing and said he wanted to consult me privately, and requested my law partner, Mr. Kelley, to step into the other room of our office, which he did. Appellant appeared to be intensely excited—more so than I had ever seen him before. I had known him from his childhood. He told me that he had just heard that deceased, Houghston, had been to his, appellant's, saloon and said that his, appellant's, mother and sister were whores, and that they had been cohabiting (he used a vulgar phrase) with negroes, and that they made in that way all appellant had, and asked me what the law was if he killed Houghston. I then read him the statute of the State concerning killing upon the use of insulting words toward a female relative, and I advised him not to have any trouble with Houghston, that he was a trifling, worthless fellow. Appellant then got up to leave, saying that was all he

wanted to know, and, as he started off, I noticed that his eyes were filled with tears, and I again, and then again, advised him to have no trouble with Houghston, that he, appellant, had had trouble enough; but he paid no attention to me, but went away.   Soon after I started out to pay some dues at the T. B. A. office, and while on the street saw a runaway carriage and horses, and immediately thereafter learned that appellant had killed Houghston.

This evidence was objected to because the consultation with witness, and his advice thereon, was privileged, because appellant consulted witness as his attorney and confidential advisor.

Was the evidence of M. D. Herring, under the surrounding facts, privileged communications, and hence not competent?

" Communications from clients to attorneys are privileged on the ground of public policy, with a view to the safe and proper administration of justice.   The protection is not qualified by any reference to proceedings pending or in contemplation.   It is adopted out of regard to the interest of justice, and from the necessity of free, unrestrained intercourse between counsel and client.   It is better in our judgment to adhere to the rule in a broad and liberal sense, than to weaken its force by exceptions.' (Crisler v. Garland, 2 S. & M., 136.)

After a very careful examination of all the authorities accessible to us, we are led to the conclusion that the above rule applies alone to civil cases.   What, therefore, is the rule in criminal cases?   In The Queen v. Cox, decided on December 20, 1884 (5 Am. Crim. Rep., 140), most, if not all, the English cases bearing upon the question at issue were cited and commented upon by the court.   In that case Judge Stevens wrote a very lengthy opinion, very carefully comparing the decisions which had before been made upon this subject.   In a great many cases he gives a concise statement of the facts under which the question was presented, and from his opinion and the cases therein cited we state the following as the rules:

1.   To be privileged the communications must pass between the client and his attorney in professional confidence and in the legitimate course of professional employment of the attorney.

2.   If the communications are by the client made to the attorney before the commission of the crime, and for the purpose of being guided or helped in its commission, they are not privileged.

3. Nor does the fact that the attorney was wholly without blame in any particular whatever affect the second rule. We are aware that this third rule is in conflict with quite a number of able opinions, but it is supported by the above case, and, we believe, by the weight of authority.

Now, let us concede (it being, in fact, absolutely true) that M. D. Herring, the attorney, was wholly without blame, no party in any respect to the homicide, yet was it not the object of appellant, in his communication with his attorney, to obtain information with respect to a contemplated crime? And did he not obtain such information as would induce rather than prevent him from the commission of the crime? It is true that the advice of the attorney was strongly calculated to prevent the crime, but from the conduct of appellant it clearly appears that he was seeking law and not advice as to what he would do. This, it seems to us, was very firmly settled in his mind, and especially if the law should be to his liking. For, after the statute had been read to him by which he was informed that the killing would be reduced from murder to manslaughter, he seems to have been satisfied, and was willing to kill Houghston and risk such punishment.

Let us suppose that Herring had informed him that he would be guilty of murder of the first or of the second degree, stating to him the punishment for each offense, would it have been as probable that he would have killed Houghston as under the law as truly given to him by Herring? Under the facts surrounding the interview between appellant and Herring, we unhesitatingly answer that it would not. Then, under the circumstances attending this interview, it is evident that its effect was to induce (though not so intended by Herring) the appellant to kill Houghston and risk being convicted of manslaughter. This being the effect, the communications between Herring and appellant were not privileged. (Green v. Cox, 5 Am. Crim. Cases, 140, and cases therein cited.)

Appellant relied upon insulting language toward female relatives, his mother and sister, to reduce the homicide from murder to manslaughter. Upon this subject the learned judge, when applying the law directly to the case, submitted to the jury the following instruction: "If you believe from the evidence, beyond a reasonable doubt, that the defendant did unlawfully kill William Houghston by shooting him with a pistol,

and that the same was done under the immediate influence of *sudden* passion (as hereinbefore defined) arising from an adequate cause, such as insulting words or conduct of the said Houghston toward female relatives of defendant, you will find defendant guilty of manslaughter."

. The objection to the charge urged by appellant is that it requires the killing to take place under the immediate influence of *sudden* passion. If this be error it is not cured in any other part of the charge, but, on the contrary, it also occurs in the definition referred to in this part of the charge. Under the facts of this case, or, in other words, under the grounds relied upon by the defendant to reduce the killing to manslaughter, is it error to instruct the jury that the killing must take place under the immediate influence of *sudden* passion? If the defendant hears of or witnesses the insulting language or conduct, he must act at once; in which case the passion would be sudden—springing at once from the cause of provocation.

But let us suppose, as was the fact in this case, that the defendant was not present, did not hear the insulting language nor witness the insulting conduct, most evidently his passion could not suddenly arise from the provocation—provoking cause. Now the provocation, the adequate cause, must produce the passion, and for the passion to be sudden it must spring directly and instantly from the provocation. How could this be the case when defendant may not have been informed of the provocation for several days, weeks or months after the giving of the provocation? Again, must the passion suddenly, instantly arise in the mind of the defendant upon being informed of the insulting language or conduct, and remain up to the time of the homicide? Owing to the peculiar nature of this provocation, and when the question is viewed in the light of Article 597, Penal Code, we are of the opinion that the last question must be answered in the negative.

The language used by Houghston toward the mother and sister of appellant was calculated to arouse the passion of any human being, save a complete moral wreck. And while with some persons, upon being informed of such language, the passion would spring at once into existence, with another, the more he reflected the higher, the greater would be the passion; for upon reflection the insult, with all its blighting consequences (not only the immediate but for all time to come), would be

comprehended. Hence, there may be cases, owing to the provocation and disposition of the party offended, in which the passion may not suddenly arise upon being informed of the insulting language or conduct, but after reflection and before the killing he may be completely under the control of the passion produced by such provocation; and especially would this be the case upon meeting with the party giving such an insult.

Now let us briefly notice Article 599. Insulting words or conduct toward a female relative of the party killing is deemed an adequate cause—cause to produce the passion. The cause is the words or conduct. There must be passion produced by the cause. When must the passion arise? If the defendant is not present, does not hear the words or witness the conduct, we answer, before the killing. Article 599 provides that when it is sought to reduce the homicide to manslaughter by reason of this character of provocation or cause, it must appear that the killing took place, if the defendant hears the words or witnesses the conduct, immediately upon the happening of the conduct or the utterance of the language; but, if defendant was not present, did not hear the words or witness the conduct, so soon thereafter as the defendant may meet the person killed, after being informed of such insults.

We are of the opinion that in a case in which defendant was not present, did not hear the words or witness the conduct, to reduce the homicide to manslaughter it must appear that the party killed used insulting words or conduct toward a female relative; that before the homicide defendant was informed of such insults; that he killed by reason of the passion produced by the insult, the words or conduct, and from no other cause.

But it may be contended that, if error is conceded in the charge just mentioned, this is cured by another part of the charge, to wit: "By the expression 'under the immediate influence of passion' is meant the act must be directly caused by the passion arising out of the provocation, which may have been given at the time or before the killing. It is not enough that the mind is merely agitated by the passion arising from some other provocation, or a provocation given by some other person than the party killed."

To my mind the evident object of this part of the charge was for the purpose of instructing the jury that the killing must be caused directly by the provocation (whether given at the time or not); that, though the mind may be agitated by passion, yet,

unless agitated by passion arising from a certain provocation, and that said provocation must have been given by the party killed, the law would not reduce the crime to manslaughter. In this part of the charge there is no attempt on the part of the learned judge to convey the idea that the passion may arise at any time before the killing. This was not the subject nor object of the charge under discussion. The writer is of the opinion that there is reversible error in this part of the charge just discussed. My brethren do not agree to this.

There was evidence calling for a charge upon the law of self defense, and among other things, the learned judge submitted the following: "Homicide is justifiable in the protection of the person against any unlawful and violent attack, but in such case all other means must be resorted to for the prevention of the injury, and the killing must take place while the person killed is in the very act of making such unlawful and violent attack." The learned judge begins the law of self defense with this general proposition, and it will be seen that it is unconditional, and does not refer to any other clause of the charge upon this subject.

The true rule upon this subject is this: If, to protect the person against an unlawful and violent attack, and such unlawful and violent attack is not *mutual,* or is not such as is described in Article 568, Penal Code, then the party must resort to all other means to prevent the injury, and the killing must take place while the person killed is in the very act of making such unlawful and violent attack.

Referring to the evidence bearing upon this subject it is seen that this charge was not called for, and should not have been given at all, not even if correctly given. For, if deceased made an attack upon the person of defendant it was a murderous attack, coming clearly within the provisions of Article 568, and, in order to protect himself from such attack, he is not required to resort to other means to prevent the threatened injury, nor to kill his adversary while in the *very* act of making such attack, but may kill at once.

While it is true that the law of self defense in preventing murder is correctly stated in the twentieth paragraph of the charge by simply giving in charge to the jury the statute, still there is no qualification made to the obnoxious charge contained in the sixteenth paragraph except by inference. The jury may have made the proper inference and engrafted upon the six-

teenth paragraph the proper limitations and qualifications, but this never should be required of a jury. As the sixteenth paragraph of the charge heads the law of self defense, and is general and without qualification, it is highly probable that the jury qualified all subsequent paragraphs of the charge upon self defense with the instructions contained in the sixteenth paragraph. This view is strongly supported by the fact that there could be no controversy as to the nature of the attack, if any, made by deceased upon defendant, it being nothing less than a felonious attack, or with intent to murder, and nothing short of this.

Again, if the evidence tended to show an attack of less magnitude than to murder, then a majority of this court holds that the court should have instructed the jury that if the attack produced in the mind of defendant a reasonable expectation or fear of death, or some serious bodily injury, then the defendant would not be required to resort to other means to prevent the threatened injury, nor kill while his adversary was in the very act of making the attack, but might kill instantly. There is no such charge as this submitted to the jury.

We are of the opinion that notwithstanding the charge of the court of which we have been treating was not at the time excepted to, nor instructions requested, yet, when viewed with reference to the whole record, there is strong probability of injury to defendant.

The judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Opinion delivered December 17, 1886.